IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:25-CR-5 |
| MICHAEL JAIME INOFUENTES, | Hon. Patricia T. Giles |
| *Defendant*. | |

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS [DKT. 60]**

The government's border search authority dates back to the nation's founding and is rooted in the sovereign's right, "subject to substantive limitations imposed by the Constitution," to control "who and what may enter the country." *United States v. Ramsey*, 431 U.S. 606, 620 (1977). Even before the adoption of the Fourth Amendment, border searches "have been considered to be 'reasonable' by the single fact that the person or item in question had entered into our country from outside." *Id*. at 619. The rule that the defendant now asks this Court to adopt—that a manual search of a cell phone at the border requires reasonable suspicion—has not been adopted by any circuit court in this country. And, it has been expressly rejected by the Eleventh Circuit, where the at-issue border search occurred, as well as the four other circuit courts to examine this issue after the Supreme Court's ruling in *Riley v. California*. However, even if this Court decides that reasonable suspicion is required for the manual inspection of a cell phone at the border, law enforcement had it in this case. Further, even if this Court concludes that the manual border search violated the Fourth Amendment, suppression is not warranted because the agents acted in good faith reliance on binding Eleventh Circuit precedent. Therefore, the Court should deny the defendant's Motion to Suppress (Dkt. 60).

1

## FACTUAL BACKGROUND

**I.      Child Sex Tourism is a Pervasive and Growing Issue in Colombia.**

For the past several years, Colombia—and Medellin in particular—has been combatting a rise in the commercial sexual exploitation of its children and tourists who travel to Colombia to sexually abuse children. *See, e.g.,* Kejal Vyas, "The Dark Side of Colombia Tourism: Child Sex Trade in Medellin" (Jun. 8, 2024).[1] (Attached as Exhibit 1). In 2023 alone, there were reportedly 1,259 cases of possible sexual exploitation of minors in Medellin—a nearly 60% increase from the year before. *See* Astrid Sarez, "Murdered tourists and sex trafficking exposes dark side of Medellin's tourism boom" (Feb. 22, 2024). [2] U.S. citizens account for some of these tourists who travel to Medellin to buy children for sex. *See* Jesus Mesa, "The American Travel Hotspot Where a Tourist Is Dying Every Week" (Jun. 25, 2024) (In response to notorious child sex trafficking case involving a U.S. citizen, "Medellín Mayor . . . issued a six-month prostitution ban in tourist areas to combat child exploitation.").[3]

To combat the rising issue of child sexual exploitation and child sex tourism, in April 2024, Medellin's local government launched the "Don't Even Try It" campaign. *See* Richard Emblin, "Medellín launches sex abuse prevention campaign for foreign visitors" (Apr. 16, 2024).[4] According to the international charity Children Change Colombia, the Don't Even Try It campaign "is part of a wider strategy launched . . . by the mayor of Medellin, which has prohibited paying for sexual services and has required nightlife venues to reduce their operating

---

[1] Also available at: www.wsj.com/world/americas/the-dark-side-of-colombia-tourism-child-sex-trade-in-medellin-2c583fad.

[2] Available at: www.independent.co.uk/news/world/americas/medellin-colombia-tourism-murder-america-b2500497.html.

[3] Available at: www.newsweek.com/medellin-colombia-american-tourist-deaths-1917228.

[4] Available at: thecitypaperbogota.com/news/medellin-launches-sex-abuse-prevention-campaign-for-foreign-visitors/.

hours to close by 1.00am." *See* "The Dark Side of the Tourism Boom in Medellín: Commercial Exploitation of Children."[5] As depicted below, the campaign involves the prominent display of flyers and large posters strategically placed at hotels, bars, and airports, warning visitors that they face up to 25 years in prison if they are found guilty of exploitation of a minor.



*See* Santiago Olivares Tovon, "At the airport, controls and campaigns against child abuse by foreigners will be increased" (Apr. 10, 2024).[6] The sign depicted above reads, "Don't even try it! It's a crime! You can get up to 25 years in prison." The bottom of the sign reads, "In Medellin, we stand united in condemning sexual and commercial exploitation of boys, girls and adolescents." The sign is also depicted below in English, posted near a bus stop in Medellin.[7]

---

[5] Available at: childrenchangecolombia.org/the-dark-side-of-the-tourism-boom-in-medellin-commercial-exploitation-of-children/ (last accessed May 1, 2025).

[6] Available at: www.elcolombiano.com/medellin/estrategias-de-la-alcaldia-de-medellin-en-el-aeropuerto-contra-los-delitos-sexuales-BE24207035 (translated from Spanish to English via Google translate).

[7] *See* thecitypaperbogota.com/news/medellin-launches-sex-abuse-prevention-campaign-for-foreign-visitors/.



The scourge of child sex tourism and sexual exploitation of minors in Colombia has become so severe that in 2014 Colombian law enforcement partnered with Homeland Security Investigations (HSI) Cartagena for training to assist local law enforcement in investigating child pornography and child sex tourism in Colombia. *See* Homeland Security Investigations Newsroom, "HSI Cartagena coordinates training designed to curb child sex crimes."[8] In 2024, Colombian law enforcement traveled to the Federal Law Enforcement Training Center at Glynco, Georgia for additional training. *Id*. And the Medellin municipal government has provided HSI an office in Medellin for its use in investigating child sex trafficking, including interviewing subjects and victims.

---

[8] Available at: www.ice.gov/news/releases/hsi-cartagena-coordinates-training-designed-curb-child-sex-crimes (last accessed May 1, 2025).

## II.    HSI-Miami Has Been Investigating Leads Connected to an American Child Sex Trafficker Since April 2024.

Since at least April 2024, HSI-Miami Special Agent (SA) Miranda Ballard has been investigating Stefan Correa, an American man who recently pleaded guilty to attempted child sex trafficking and production of child pornography, *see United States v. Stefan Andres Correa*, 1:24-cr-20186-BB, ECF 57 (Plea Agreement) (S.D. Fl. Mar. 10, 2025), and other individuals connected to his crimes.

SA Ballard became an HSI agent in 2019. Since then, she has been assigned exclusively to Miami International Airport (MIA). SA Ballard works in HSI-Miami's Passenger Group 2 and responds to calls from Customs and Border Protection (CBP) related to travelers suspected of transnational crimes, including narcotics, weapons, human, and sex trafficking, and human smuggling. Her training included a focus on transnational crime and cross-border criminal investigations. Prior to joining HSI, SA Ballard worked for two years as a criminal investigator with the Naval Criminal Investigative Service (NCIS), where she investigated offenses including sexual assault and child sexual abuse. SA Ballard's investigation of Correa stemmed from the investigation of another American man, who had allegedly traveled to Medellin for three days in March 2024 and sexually exploited three minor girls there. A subsequent HSI investigation of that man revealed a connection between the three minor girls and Stefan Correa.

On April 18, 2024, SA Ballard placed a CBP lookout[9] for Correa, who was scheduled to depart the same day from MIA to Bogota, Colombia. HSI stopped Correa on the jet bridge as he attempted to board his flight and took him for a border search, pursuant to border search authority. *See Correa*, 1:24-cr-20186-BB, ECF 58 (Factual Proffer) at 1. Correa was searched

---

[9] A lookout is an entry in a CBP database, which alerts customs officials to send the traveler for secondary inspection upon arrival at customs.

and found to be in possession of nine cell phones. *Id.* Pursuant to border search authority, SA Ballard conducted a manual inspection of Correa's cell phones, which were found to contain over 100 videos of Correa having sex with approximately 50 minor girls between the ages of approximately 10 and 17 in Colombia. *Id.* at 1-2. Correa's cell phones also contained messages between Correa and a child sex trafficker in Colombia. *Id.* at 2. The trafficker told Correa they had minor girls between the ages of 11 and 12 available for sex. *Id*. Correa told the trafficker he would pay her $300,000 Colombian Pesos (COP), the equivalent of approximately $75 USD, and would pay each of the minor girls the same amount and give them an iPhone. *Id*. at 2-3. At her request, Correa sent the trafficker the payment through Nequi, a digital money transfer platform used in Colombia. *Id*. at 3. SA Ballard interviewed Correa, and he admitted that he intended to travel to Colombia to have sex with a minor girl. *Id*. Correa was arrested at MIA and charged via complaint with violations of 18 U.S.C. §§ 1591(a)(1)/(b)(1), 1594(a) (attempted sex trafficking of a minor), and 2423(b)/(e) (attempted travel to engage in illicit sexual conduct). *See Correa*, 1:24-cr-20186-BB, ECF 1 (criminal complaint).[10]

After Correa's arrest in April 2024, SA Ballard continued to investigate Correa and individuals related to his crimes. Her investigation revealed that Correa traveled frequently to Colombia to engage in commercial sex with children. *See Correa*, 1:24-cr-20186, ECF 1 at 8 (Correa made approximately 45 trips to Colombia between 2022 and April 2024). His travel history showed he traveled there roughly every two weeks and typically spent three to four days there. Correa exclusively paid for sex with minors in Colombia. He primarily used WhatsApp to

---

[10] On March 10, 2025, Correa pleaded guilty to attempted sex trafficking of a minor, in violation of 18 U.S.C. §§ 1591(a)(1)/(b)(1), and 1594(a), and production of material involving sexual exploitation of minors, in violation of 18 U.S.C. § 2251(a)/(e). *See Correa*, ECF 57 (Plea Agreement).

communicate with traffickers, recruiters, and minor victims there, and he used different money transfer platforms, including Western Union (before he was banned), Remitly, and Nequi.

A review of Correa's cell phones and his Facebook account (searched pursuant to a search warrant) revealed that he preferred to have sex with prepubescent girls. Occasionally, when a girl became too old for Correa, he would use her to recruit other minor girls for sex and then paid the recruiter a finder's fee. The finder's fee varied based on the age of the girl. For example, at one point he offered to pay $500,000 COP for a 10-year-old and $200,000 COP for a 13-year-old. Correa also took sexually explicit images and videos of himself having sex with the minor victims, which he stored on his cell phones.

One of Correa's cell phones contained WhatsApp communications with an individual hereinafter referred to as "Subject-1" (and later identified as a Colombian national). In 2023, Correa and Subject-1 exchanged WhatsApp messages indicative of a prior sexual relationship, although at the time of the chat it appeared that the sexual relationship had ended. Correa's Facebook account contained a video that showed Correa and Subject-1 having sex. SA Ballard's investigation of Correa also revealed two payments to Subject-1 via Remitly for $63 USD (September 1, 2023) and $78 USD (January 10, 2024). Based on this information, SA Ballard concluded that Subject-1 had likely been a victim of Correa's at one point, but had become too old for him and was likely recruiting other minor girls for him to exploit and abuse.

In August 2024, HSI-Miami sent an administrative subpoena to Western Union for transaction history for individuals to whom Correa had sent money, including Subject-1. *See* Exhibit 2 (redacted Western Union transaction history for Subject-1). The responsive records revealed five separate payments to Subject-1 from the defendant between October 17, 2023, and

October 25, 2023. The payments ranged from approximately $13 USD to $47 USD and were consistent with amounts that Correa had paid to recruiters as a finder's fee.

Since April 2024, SA Ballard has traveled to Colombia four separate times (June and September 2024, January and April 2025) in furtherance of the Correa investigation and leads related to him. While there, she has interviewed, or observed interviews, of suspected child sex traffickers, recruiters, and minor victims. She has also visited many locations in Medellin commonly used to advertise and solicit commercial child sex, including San Diego Street.

### III. HSI-Miami Had Reasonable Suspicion to Believe the Defendant Was Involved in Child Sex Trafficking in Colombia.

After HSI obtained Subject-1's Western Union records and identified the defendant, they investigated his travel history and criminal history. The defendant's criminal history and open-source records revealed that he had a prior charge for domestic assault and battery and an association with a children's toy charity in El Salvador.  The domestic assault and battery charge, which involved the defendant's ex-wife, was significant to SA Ballard, who knew that trafficking victims in Colombia, particularly minor girls, were often physically abused while being sexually exploited. SA Ballard reviewed the defendant's travel records, which revealed he had traveled to Colombia extensively since at least 2016, including 14 trips in 2024, 10 trips in 2023, and 10 trips in 2022. *See* Exhibit 3 (CBP travel records). His trips were of various durations, including many between two and five days. The travel records also showed that on many occasions the defendant departed Colombia from Medellin. The combination of the defendant's travel to Medellin, the frequency and short duration of the trips over a sustained period of time, and his payments to Subject-1, raised a striking parallel to the Correa case.

IV.    **CBP and HSI Conducted a Routine Border Search of the Defendant at MIA.**

On November 1, 2024, HSI-Miami sent a request for assistance to CBP at MIA to conduct a secondary border inspection of the defendant, who was due to arrive later that day on a flight from Medellin, Colombia. SA Ballard indicated to CBP that she wanted to do a manual search of any phones for evidence of international child sex trafficking and child pornography. The request was based on SA Ballard's suspicion that the defendant was engaged in child sex trafficking in Colombia and might possess child sexual abuse material (CSAM) on his electronic devices, as Correa had. When the defendant arrived in Miami, he went through customs and was then taken for a secondary border inspection, pursuant to CBP's border search authority. At the secondary inspection area, CBP Officer Fernanda de Oliveira conducted an admissibility interview of Inofuentes and detained his electronic devices, including his iPhone 14 and Galaxy Z Fold. Inofuentes provided the passcodes to the phones. Oliveira unlocked the phones, placed them in airplane mode, and then provided the phones to SA Ballard for her to perform a manual inspection.

SA Ballard performed a manual inspection of Inofuentes's iPhone 14 and Galaxy Z Fold. She spent up to approximately 30 minutes inspecting the phones; however it took her approximately 1 minute or less to find the defendant's March 2024 WhatsApp chats with MV1.[11] When SA Ballard opened the iPhone 14, she performed keyword searches for "age" and "minor" in both Spanish and English. The search for "menor" (Spanish for minor) brought up a

---

[11] The defendant characterizes SA Ballard's short, targeted search as a "fishing expedition," Dkt. 61 at 9, and a "black box review" of his iPhone, Dkt. 61 at 6. Far from sweeping, SA Ballard cabined her search to chat platforms and the photo gallery. SA Ballard began her manual inspection by searching keywords relevant to her investigation—age and minor—and in so doing found key evidence of the defendant's solicitation of MV1 in approximately 1 minute. That is the exact opposite of a fishing expedition.

WhatsApp chat with MV1 (later identified as a 15-year-old Colombian girl) wherein MV1 discussed her status as a minor with the defendant.[12] SA Ballard then reviewed the chat with a Spanish-speaking agent and saw references to MV1's status as a minor, sex, drugs, and commercial sex with the defendant. *See* Exhibit 4 (photos of Inofuentes's iPhone 14 taken at MIA); Exhibit 5 (HSI's English translation of the March 2024 WhatsApp chat). SA Ballard also saw pictures in the WhatsApp chat that appeared to depict a minor girl lying in a bed holding a stuffed bear and a picture of the same girl posing with the defendant. After reviewing the WhatsApp chat, SA Ballard reviewed the iPhone 14's other chat platforms and checked the photo gallery for CSAM. In the photo gallery, she observed photos depicting females who appeared to be age-difficult, meaning they could have been pubescent minors or they could have been adults.

After reviewing his iPhone, SA Ballard interviewed the defendant. At the conclusion of the interview, the defendant left MIA and returned to Virginia. HSI-Miami detained his cell phones for forensic examination pursuant to their border search authority. On November 4, 2024, the defendant attempted to board a flight from Washington Dulles International Airport, in the Eastern District of Virginia, to Bogota, Colombia. He was stopped by HSI agents on the jet bridge and taken to a secondary inspection area for another interview. At the conclusion of the interview, agents arrested the defendant.[13]

---

[12] Law enforcement initially believed MV1 was 16 years old based on her date of birth in a Colombian government database. *See* Dkt. 2 at 9. However, the government recently obtained a copy of her birth certificate, which shows she was actually 15 years old. The error was based on the date format used in Colombia (DD/MM/YY) versus the date format used in the U.S. (MM/DD/YY).

[13] The government provided additional facts regarding the investigation and the defendant's interview statements and admissions can be found in the government's briefing at Dkt. Nos. 42 and 51, incorporated herein by reference.

## PROCEDURAL HISTORY

On November 5, 2024, the defendant was charged via criminal complaint with engaging in illicit sexual conduct in a foreign place, in violation of 18 U.S.C. § 2423(c) and (g)(2). Dkt 1. On January 8, 2025, the grand jury returned a single-count Indictment charging the defendant with engaging in, and attempting to engage in, illicit sexual conduct in a foreign place, in violation of 18 U.S.C. § 2423(c), (f), and (g)(2). Dkt. 25. On April 22, 2025, the grand jury returned a Superseding Indictment, which added a charge of sex trafficking of a child, in violation of 18 U.S.C. §§ 1591, 1594, and 1596. Dkt. 64. A jury trial is currently set to begin on September 9, 2025. On April 17, 2025, the defendant filed a motion to suppress all evidence derived from the search of his iPhone 14 and all evidence that was the fruit of that search based on the border search conducted at MIA. Dkt. 60, 61.

## ARGUMENT

No circuit court, either before or after *Riley v. California*, has ever required reasonable suspicion for a manual search of a cell phone at the border. *United States v. Castillo*, 70 F.4th 894, 897–98 (5th Cir.), cert. denied, 144 S. Ct. 410, 217 L. Ed. 2d 221 (2023) ("when it comes to manual cell phone searches at the border, our sister circuits have uniformly held that *Riley* does not require either a warrant or reasonable suspicion."). The federal government has long-standing border search authority, which recognizes that the United States' interest "in preventing the entry of unwanted persons and effects is at its zenith at the international border," and that entrants have substantially diminished privacy interests at the border, allowing for suspicionless searches of their possessions. *United States v. Flores-Montano*, 541 U.S. 149, 152-154 (2004). *Riley* does not alter this precedent. *See United States v. Laynes*, 481 F. Supp. 3d 657, 664 (S.D. Ohio 2020) ("The difference in context between the border-search exception and the search-incident-to-arrest

11

exception is critical. The Fourth Amendment's balance is struck much more favorably to the Government considering the Government's duty to protect the integrity of the border measured against the traveler's decreased expectation of privacy.") (cleaned up). The Eleventh Circuit, where this border search occurred, has expressly rejected this argument in at least three separate opinions post-*Riley*. *See United States v. Vergara*, 884 F.3d 1309, 1312 (11th Cir. 2018); *United States v. Touset*, 890 F.3d 1227, 1234 (11th Cir. 2018) (no heightened level of suspicion is required even for a forensic border search); *United States v. Pulido*, 133 F.4th 1256, 1274 (11th Cir. 2025). And even under the stricter standard in the Fourth Circuit, *see United States v. Kolsuz*, 890 F.3d 133 (4th Cir. 2018) (requiring reasonable suspicion for forensic search), the defendant's argument fails.

Contrary to the defendant's claim that the nature of the search (manual or forensic) "makes no difference for purposes of the Fourth Amendment" (Dkt. 61 at 12, 13), there is a meaningful difference—practically and legally—between a manual border search of a cell phone and a nonroutine forensic search of a cell phone with specialized forensic tools.[14] *See Kolsuz*, 890 F.3d at 146 ("the distinction between manual and forensic searches is a perfectly manageable one . . . and [] treating forensic phone searches as nonroutine need not interfere

---

[14] The defendant cites *United States v. Sultanov*, 742 F. Supp. 3d 258, 286 (E.D.N.Y. July 24, 2024) for this proposition. But the holding in *Sultanov*—nonroutine border searches of electronic devices require probable cause and a warrant—is in tension with existing Second Circuit precedent and other EDNY district court decisions made both before and after *Sultanov*. *See e.g., Matta v. United States*, 753 F. Supp. 3d 194 (E.D.N.Y. Oct. 7, 2024) (decided after *Sultanov*, holding "[n]on-routine border search of international traveler's personal electronic device resulting in off-site forensic imaging and copying requires government to have at least reasonable suspicion given heightened privacy interests in contents of such personal electronic devices."); *see also United States v. Irving*, 452 F.3d 110, 124 (2d Cir. 2006) ("A border search is valid under the Fourth Amendment, even if non-routine, if it is supported by reasonable suspicion."). Critically, *Sultanov* is not binding on this court or any other court.

unduly with the agency's protective mission at the border") (citing *United States v. Cotterman*, 709 F.3d 952, 967 (9th Cir. 2013) (categorizing forensic searches as nonroutine requires only "that officers make a commonsense differentiation between a manual review of files on an electronic device and application of computer software to analyze a hard drive.")). Indeed, the five circuit courts to have addressed this issue after *Riley* have all agreed that manual searches of a traveler's electronic device at the border are routine border searches requiring no individualized suspicion. *See United States v. Mendez*, 103 F.4th 1303, 1310 (7th Cir. 2024) (manual searches of electronic devices are routine border searches requiring no individualized suspicion); *Castillo*, 70 F.4th 894 at 898 (5th Cir. 2023) (same); *Alasaad v. Mayorkas*, 988 F.3d 8, 18-19 (1st Cir. 2021) (same); *United States v. Cano*, 934 F.3d 1002, 1016 (9th Cir. 2019) (same); *Touset*, 890 F.3d 1227 at 1234 (11th Cir. 2018) (the Fourth Amendment does not require any suspicion for forensic searches of electronic devices at the border, even though such devices could store vast quantities of records or effects.).

Because the at-issue border search occurred in the Eleventh Circuit, the applicable suppression standard is that of the Eleventh Circuit. *See, e.g.*, *United States v. Haack*, 2024 WL 2747351, at *4 (D.N.M. May 29, 2024) (analyzing motion to suppress under law where the search occurred, according to *lex loci* approach) (collecting cases); *United States v. Villanueva*, No. 5:17-CR-50049, 2019 WL 2931559, at *4 (D.S.D. Feb. 8, 2019) ("'the proper suppression standard to apply is that of the federal jurisdiction in which the allegedly illegal conduct took place'"), *report and recommendation adopted*, 2019 WL 2285509 (D.S.D. May 29, 2019); *United States v. Ozuna*, 129 F. Supp. 2d 1345, 1354 (S.D. Fla. 2001) ("The few federal cases that have addressed a similar choice-of-law issue in the criminal context have adopted a lex loci (i.e., the 'law of the place' of the conduct) approach."), *aff'd*, 48 F. App'x 739 (11th Cir. 2002);

*United States v. Longo*, 70 F. Supp. 2d 225, 261 (W.D.N.Y. 1999) ("With respect to challenges to the validity of electronic surveillance, 'the governing law should be that of the place where the electronic surveillance occurred.'"); *United States v. Gerena*, 667 F. Supp. 911, 918 (D. Conn. 1987) ("Any approach that would force law enforcement officials to look other than to the laws of the Courts that directly supervise their activities is likely to lead to chaos and be replete with procedural traps."). However, even if this Court applies the more burdensome suppression standard applicable in the Fourth Circuit, the defendant's arguments still fail as he cannot cite to any binding authority requiring heightened suspicion for a routine, manual border search of a cell phone.

The defendant effectively seeks to eliminate any distinction between an HSI agent's manual review of the contents of an entrant's cell phone (i.e., literally thumbing through the device) and an advanced forensic search of the phone, requiring, at a minimum, specialized forensic tools to extract the phone's data, but oftentimes additional forensic tools to process the data into a readable format. The defendant is wrong, and his motion should be denied for the following reasons: (1) the manual search of the defendant's iPhone at MIA was a lawful exercise of the government's broad border search authority and did not require any heightened level of suspicion; (2) regardless, law enforcement had reasonable suspicion of contraband and ongoing transnational crime to search the iPhone; and (3) even if the Court concludes that the search violated the Fourth Amendment, suppression is not warranted because the agents acted in good faith reliance on binding Eleventh Circuit authority.

## I.    The Fourth Amendment Permits Suspicionless Searches at the Border.

The Fourth Amendment safeguards the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

14

Searches of persons and their effects at the border constitute a long-recognized exception to the Fourth Amendment's warrant requirement. *Ramsey*, 431 U.S. at 616–19. The authority to conduct warrantless border searches advances the United States' "inherent authority" and "paramount interest" in protecting its "territorial integrity," which "is at its zenith" at the border. *Flores-Montano*, 541 U.S. at 153; *see also United States v. Ickes*, 393 F.3d 501, 506 (4th Cir. 2005) (characterizing the government's interest as "overriding"). This substantially elevated governmental interest renders "the Fourth Amendment's balance of reasonableness . . . qualitatively different at the international border than in the interior," specifically, "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is . . . struck much more favorably to the Government at the border." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538–40 (1985) (internal citation omitted); *see also United States v. Nkongho*, 107 F.4th 373, 381 (4th Cir. 2024) ("the government's interests at the border are 'paramount,' and forensically searching a traveler's electronic devices may be vital to promoting those interests"); *Ramsey*, 431 U.S. at 623 n.17 (recognizing lack of "statutorily created expectation of privacy" at the border and the "constitutionally authorized right of customs officials" to search persons and goods at the border).

"The Supreme Court has long held that border agents need no warrant, nor any individualized suspicion, to conduct routine searches of the person and effects of entrants." *Nkongho*, 107 F.4th at 381 (internal quotation marks omitted) (quoting *Montoya de Hernandez*, 473 U.S. at 538); *see also Montoya de Hernandez*, 473 U.S. at 537 (citing *Ramsey*, 431 U.S. at 616–17) (Broad authority "to conduct routine searches and seizures at the border, without probable cause or a warrant" has existed "[s]ince the founding of our Republic."); *United States v. Aigbekaen*, 943 F.3d 713, 720 (4th Cir. 2019) ("[A]t a border or its functional equivalent, like

an international airport[,] government agents may conduct routine searches and seizures of persons and property without a warrant or any individualized suspicion."). Routine searches of people and effects at the border—which have included examining the contents of a freight container and personal luggage, *see United States v. Oriakhi*, 57 F.3d 1290, 1297 (4th Cir. 1995), opening mail, *see Rams*ey, 431 U.S. at 620, and disassembling and reassembling a vehicle's fuel tank, *see Flores-Montano*, 541 U.S. at 155—are *per se* reasonable and require no particularized suspicion at all. *Kolsuz*, 890 F.3d at 137; *see also Ramsey*, 431 U.S. at 616; *Montoya de Hernandez*, 473 U.S. at 538 ("Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant.").

The rationale behind the border search authority is based on a number of broad congressional powers enumerated in the Constitution, including Congress' authority "to prevent smuggling," to "prevent prohibited articles from entry," and "[t]o regulate Commerce with foreign Nations." *United States v. 12 200-Ft. Reels of Super 8 MM. Film*, 413 U.S. 123, 125 (1973). Simply put, it is "axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *Ickes*, 393 F.3d at 506 (quoting *Flores–Montano*, 124 S.Ct. at 1586). That authority includes uncovering "information about an ongoing transnational crime," which the Fourth Circuit has said "fits within the core of the rationale underlying the border search exception." *Kolsuz*, 890 F.3d at 144. Indeed, border searches are not limited to seizure of contraband itself, but can also be used to uncover information related to transnational crimes. *See Alasaad*, 988 F.3d at 20 (The "border search exception is not limited to searches for contraband itself rather than evidence of contraband or a border-related crime."); *United States v. Gurr*, 471 F.3d 144, 149 (D.C. Cir. 2006) (holding that in the context of border searches, the "distinction . . . between contraband

16

and documentary evidence of a crime is without legal basis"); *United States v. Xiang*, 67 F.4th 895, 900 (8th Cir. 2023) (rejecting argument that the Fourth Amendment does not permit border searches for evidence); *Nkongho*, 107 F.4th at 381 (purpose of the border search exception includes among other things "evidence of ongoing transnational criminal activity") (citing *Kolsuz*, 890 F.3d at 143-44, and *Aigbekaen*, 943 F.3d at 721.).

The government is also obligated to "secur[e] the safety of its citizens, and to do this it must seek to prevent 'the introduction of contraband into this country.'" *Ickes*, 393 F.3d at 506 (quoting *Montoya de Hernandez*, 473 U.S. at 537). Contraband includes digital contraband, such as child pornography. *See Cano*, 934 F.3d at 1014 ("The best example [of digital contraband] is child pornography") (citing *United States v. Molina-Isidoro*, 884 F.3d 287, 295 n.3 (5th Cir. 2018) (Costa, J., specially concurring) ("One type of contraband that can be stored within the data of a cell phone . . . is child pornography.")). To effectively prevent the importation of contraband, like child pornography, across the border, customs officers must search entrants' electronic devices as "most child pornography crimes involve use of a computer." *United States v. Roehl*, 561 F. App'x 531, 532 (7th Cir. 2014). Allowing routine searches of a cell phone at the border is thus not only consistent with *Riley*, but also reflects that which "[b]oth Congress and the Supreme Court have made clear": "extensive searches at the border are permitted, even if the same search elsewhere would not be." *Ickes*, 393 F.3d at 502; *cf. United States v. Hernandez*, 2016 WL 471943, at *3 n.2 (S.D. Cal. Feb. 8, 2016) (stating that, in *Riley*, the Supreme Court "gave no indication that [its] holding applied to the border search exception"); *United States v. Saboonchi*, 48 F. Supp. 3d 815, 819 (D. Md Jul. 28, 2014) (recognizing that "*Riley* did not diminish the Government's interests in protecting the border or the scope of the border search exception" and denying defendant's motion to reconsider, in light of *Riley*, ruling that

warrantless border search of phone was constitutional). Indeed, the Fourth Circuit has recognized that "[t]he realization that important national security interests are at stake 'has resulted in courts giving the broadest interpretation compatible with our constitutional principles in construing the statutory powers of customs officials.'" *Ickes*, 393 F.3d at 505 (quoting *United States v. Stanley*, 545 F.2d 661, 666 (9th Cir. 1976)).

Correspondingly, travelers have a diminished expectation of privacy at the border. *Nkongho*, 107 4th at 382 (citing *Flores-Montano*, 541 U.S. at 154); *see also United States v. Alfaro-Moncada*, 607 F.3d 720, 728 (11th Cir. 2010) ("At the border, an individual has a lesser expectation of privacy, the government has a greater interest in searching, and the balance between the interests of the government and the privacy right of the individual is struck more favorably to the government."). International travelers know that, by virtue of their voluntary decision to present themselves for entry into or exit out of the United States, they are subject to the government's plenary search authority. *See Cotterman*, 709 F.3d at 967 ("International travelers certainly expect that their property will be searched at the border."). Knowing this, travelers have several options, including avoiding traveling to and from the United States, leaving their personal technology devices behind, or removing from their personal technology devices any information that they would not want accessed by customs officers. *See Cotterman*, 709 F.3d at 978, n.8 (Callahan, J., concurring in part) (quoting *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 463 (1990) (Stevens, J., dissenting)) ("The fact that border searches occur at fixed times and checkpoints makes them inherently less intrusive; a person with advance notice of the location of a permanent checkpoint has an opportunity to avoid the search entirely, or at least to prepare for, and limit, the intrusion on her privacy.") (citing *Montoya de Hernandez*, 473 U.S. at 544 ("Respondent's detention was long, uncomfortable, indeed, humiliating; but both its length

and its discomfort resulted solely from the method by which she chose to smuggle illicit drugs into this country.")). Unlike searches incident to arrest, which often involve situations in which the search is triggered by unanticipated and non-voluntary contact with law enforcement, travelers can expect the possible intrusion into their privacy when they voluntarily carry an electronic device across the border.

## II.    A Manual Search of a Cell Phone at the Border Does Not Require Any Heightened Level of Suspicion.

The defendant now seeks to have this Court adopt a rule—unprecedented in the Fourth Circuit and expressly rejected by every other circuit to consider the issue, including the Eleventh—that a manual search of an entrant's cell phone at the border requires individualized suspicion. Manual searches "are examinations of an electronic device that do not entail the use of external equipment or software and may be conducted without suspicion," *Kolsuz*, 890 F.3d at 146 n.6, whereas a forensic search, "unlike a manual search of a digital device . . . generally entails the connection of external equipment and/or the use of specialized software." *Aigbekaen*, 943 F.3d at 718 n.2 (internal quotation marks omitted); *see also United States v. Almadaoji*, 567 F. Supp. 3d 834, 840 (S.D. Ohio 2021) (manual search of a cell phone involves officer simply scrolling through the device to view its contents, while forensic search involves the use of computer software to analyze the contents); *Cotterman*, 709 F.3d at 960, 968 (a forensic search involves application of computer software to analyze a hard drive).

The consensus among circuits is that "brief, manual searches of a traveler's electronic device are 'routine' border searches requiring no individualized suspicion." *See Mendez*, 103 F.4th 1303 at 1310 (citing *Castillo*, 70 F.4th at 897–98 (upholding manual border search of the defendant's cell phone that involved the agent manually scrolling through various apps and finding child pornography in the photo section of his phone)); *Mayorkas*, 988 F.3d at 18–19;

*Cano*, 934 F.3d at 1016 (upholding a manual border search of the defendant's cell phone that involved reviewing a lengthy call log and text messages); *Touset*, 890 F.3d at 1234 (upholding forensic border search of the defendant's electronic devices and holding that even this nonroutine border search did not require reasonable suspicion). "The only point of divergence among the circuits is whether more intrusive, forensic electronic device searches require individualized suspicion." *Mendez*, 103 F.4th at 1310; *see also Kolsuz*, 890 F.3d at 146 (holding the forensic search of a cell phone is a nonroutine search under the border exception and requires individualized suspicion).

### A.  The Eleventh Circuit Permits Suspicionless Border Searches of Cell Phones.

In the Eleventh Circuit, reasonable suspicion is required only for border searches involving "highly intrusive searches of a person's body." *Touset*, 890 F.3d at 1234; *Alfaro-Moncada*, 607 F.3d at 729. Importantly, a "forensic search of an electronic device is not like a strip search or an x-ray" and "[a]lthough it may intrude on the privacy of the owner, a forensic search of an electronic device is a search of property." *Touset*, 890 F.3d at 1234. And the Eleventh Circuit "precedents do not require suspicion for intrusive searches of any property at the border."  *Id*.

In *Touset*, 890 F.3d at 1230, law enforcement placed a lookout on Touset, who was linked to small money payments to a person in the Philippines, known as a source country for sex tourism and child pornography. When Touset entered the country, agents detained a camera, two laptops, two external hard drives, and two tablets and conducted a forensic examination of the devices, which were ultimately found to contain CSAM. *Id*. Touset unsuccessfully moved to suppress the evidence. On appeal, the Eleventh Circuit stressed that "searches at the border of the country " 'never require probable cause or a warrant.' " *Id*. at 1232 (quoting *Ramsey*, 431 U.S. at

20

619). The Court further held that no level of suspicion is required for the search of property at

the border, even personal electronics. *See id*. at 1233. The Eleventh Circuit reasoned that "[t]he

Supreme Court has never required reasonable suspicion for a search of property at the border,

however non-routine and intrusive . . . ." *Id.* Instead, the court reviewed relevant Supreme Court

and circuit precedent and concluded that the reasonable suspicion standard at the border has been

reserved "only for highly intrusive searches of a person's body." *Id.* at 1233-34 (citations and

internal quotations omitted). The court found no reason to give special treatment to electronic

devices simply because "so many people now own them or because they can store vast quantities

of records or effects." *Id.* at 1233. The court was "also unpersuaded that a traveler's privacy

interest should be given greater weight than the 'paramount interest [of the sovereign] in

protecting . . . its territorial integrity." *Id.* at 1235 (citations omitted).

Just last month, in *United States v. Pulido*, 133 F.4th 1256, 1274 (11th Cir. 2025), the

Eleventh Circuit reaffirmed its holding in *Touset* that manual searches of cell phones at the

border do not require reasonable suspicion or any heightened level of suspicion. Pulido was

charged with coercion and enticement of a minor and multiple violations of Section 2423(a). *Id*.

at 1266. Pulido moved to suppress the border search of his iPhone and MacBook, arguing that

post-*Riley*, border search does not cover warrantless, suspicionless searches of electronic

devices. *Id.* at 1266-67. He also argued that searching private messages on a device, as opposed

to looking only for contraband, exceeds the historical justification for the border search

exception. *Id*. The court rejected both arguments, noting it had rejected "similar *Riley*-based

arguments in *Vergara* and *Touset*." *Id*. at 1274; *see also Vergara*, 884 F.3d at 1312–13 ("Border

searches have long been excepted from warrant and probable cause requirements, and the

holding of *Riley* does not change this rule."). The court went on to say, "in *Touset*, we reiterated

that "[a]lthough the Supreme Court stressed in *Riley* that the search of a cell phone risks a significant intrusion on privacy, our decision in *Vergara* made clear that *Riley*, which involved the search-incident-to-arrest exception, does not apply to searches at the border. In particular, we explained in *Touset* that in those instances when we have required reasonable suspicion for a border search, we have defined 'intrusiveness' by reference to bodily integrity—'the indignity that will be suffered by the person being searched.' Intrusiveness, therefore, is a function of the 'personal indignity' that a search causes, not of its scope or extent. And in *Touset*, 'we fail[ed] to see how the personal nature of data stored on electronic devices could trigger this kind of [personal] indignity' when existing precedent recognized no such afront to one's personal dignity even in the search of his home. Simply put, we said that '[p]roperty and persons are different.'" *Id.* (internal citations omitted). Thus, in this case, the manual border search of the defendant's iPhone at MIA was reasonable under the Fourth Amendment and consistent with Eleventh Circuit precedent.

### B. The Fourth Circuit Does Not Require Reasonable Suspicion For Manual Searches of Electronic Devices.

The Fourth Circuit does not require reasonable suspicion for a manual border search of an electronic device. *See Ickes*, 393 F.3d at 505–07. Even post-*Riley*, the Fourth Circuit has only required reasonable suspicion for nonroutine forensic searches of electronic devices. <u>Kolsuz</u>, 890 F.3d at 144. And the Fourth Circuit has recognized the clear distinction between manual and forensic searches of devices. *Id.* at 146. Accordingly, this court should reject the defendant's argument that the manual search of his iPhone 14 required any heightened level of suspicion.

In *Kolsuz*, the defendant argued that after *Riley*, the forensic search of his cell phone required probable cause and a warrant. 890 F.3d at 136. There, the defendant was being investigated for offenses related to illegal firearms smuggling. *Id.* at 138. He was detained at

Dulles while attempting to board a flight to Turkey and found to be in possession of firearm parts for which he did not have a federal license. *Id*. at 139. The defendant was taken to a secondary inspection area and his cell phone was manually searched by an agent who scrolled through his recent calls and text messages. *Id*. After an interview with CBP officers, the defendant was placed under arrest. *Id*. His cell phone was detained and taken to the HSI forensic lab in Sterling, where it was forensically examined by a Computer Forensic Agent (CFA). *Id*. The CFA attached the phone to a forensic tool—Cellebrite Physical Analyzer—and extracted the data from the device. *Id*. "The data extraction process lasted for a full month and yielded an 896-page report that included Kolsuz's personal contact lists, emails, messenger conversations, photographs, videos, calendar, web browsing history, and call logs, along with a history of Kolsuz's physical location down to precise GPS coordinates." *Id*. Before trial, the defendant challenged the forensic search of his cell phone at the HSI lab. *Id*. The district court held, and the Fourth Circuit agreed, that the forensic search of the defendant's cell phone was nonroutine and therefore required individualized suspicion, which CBP had in that case. *Id*. at 145-47.

Here, the basic manual search of the defendant's iPhone at the border is leagues away from the month-long advanced forensic search of Kolsuz's cell phone in the HSI forensic laboratory. *See Saboonchi*, 990 F. Supp. 2d at 547 ("[d]espite the vast amounts of data available in an electronic device, a conventional search is limited by the amount of time one Customs officer has to [review] the contents of digital evidence at the border while its owner awaits," and "the amount of data searched will be a mere fraction of what is on the device"). Critically, the manual search in this case did not involve the use of any forensic tools. *Id.* ("[A]n integral part of a forensic examination is the use of technology-assisted search methodology, where the computer searches vast amounts of data that would exceed the capacity of a human reviewer to

examine in any reasonable amount of time."). Law enforcement did no more in their manual search than anyone else could do without forensic tools. Moreover, law enforcement largely confined their brief search to WhatsApp and the photo gallery. SA Ballard performed a keyword search and spent only a minute or so inspecting the iPhone before she found evidence of the defendant engaging in child sex trafficking abroad. Again, this is a far cry from the month-long extraction process in *Kolsuz*, which ultimately yielded a nearly 900-page report covering nearly all of the cell phone's undeleted contents. *See Aigbekaen*, 943 F.3d at 718 n.2 (a forensic search is a "powerful tool capable of not only viewing data that a user has intentionally saved on a digital device, but also unlocking password-protected files, restoring deleted material, and retrieving images viewed on websites"); *Nkongho*, 107 F.4th at 381. Further, the manual search at the border served a key government interest in uncovering evidence of ongoing transnational crime and preventing the importation of the contraband (i.e., child pornography) that SA Ballard reasonably suspected would be found in the defendant's cell phone based on her investigation of Correa.

Despite the obvious and critical differences between manual and forensic searches, the defendant argues that *Riley* should lead this Court to conclude that the manual search of his iPhone was "non-routine" and "invasive." Dkt. 61 at 13. However, the concerns implicated by the search incident to arrest exception at issue in *Riley* are markedly different from the concerns underlying the border search exception. *Riley* did not involve a border search, and it did not even address border-search authority as applied to cell phones. *United States v. Wood*, 16 F.4th 529, 533 (7th Cir. 2021) ("Given the context-specific nature of the Fourth Amendment, *Riley* is not readily transferable to scenarios other than the one it addressed."); *see also Mendez*, 103 F.4th at 1308 ("What is unreasonable after arrest may be perfectly reasonable at customs, as *Riley* itself

anticipated."). And following *Riley*, no circuit court has required that law enforcement obtain a warrant before searching electronic devices at the border. *Mendez*, 103 F.4th at 1309.

In *Riley*, the Supreme Court held that a search warrant is generally required to conduct a digital search of a cellular phone seized incident to a lawful arrest, in part because the officer safety concerns that typically underlie a search incident to arrest were not implicated by the search of the cell phone. 134 S. Ct. at 2484–85. The search incident to arrest exception allows for a search of the person and the immediate vicinity of the arrestee in order to locate any weapons that might endanger the arresting officer and/or to prevent the destruction of evidence by the arrestee. *Id.* at 2483 (quoting *Chimel v. California*, 395 U.S. 752, 762–63 (1969)). "There are no comparable risks [of harm to the officer or destruction of evidence] when the search is of digital data." *Id.* at 2485. Critically, however, the Court recognized that, "even though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone." *Id.* at 2494. "The border search exception is one such case-specific exception." *Saboonchi*, 48 F. Supp. 3d at 817.

While *Riley* was based in part on the Supreme Court's determination that the search of a cellular phone *is not* closely tied to the historical justifications for searches incident to arrest, *see* 134 S. Ct. at 2484–88, the ability to conduct suspicionless searches of electronic devices at the border *is* closely tied to the historical justifications for border searches. Specifically, such searches are central to the governmental interest in uncovering evidence of ongoing transnational crime and preventing the importation of certain contraband—e.g., child pornography—and persons across the border. Indeed, the border search exception serves different and broader purposes than the search incident to arrest exception, specifically, protecting the nation's core sovereign interest in controlling the entry and exit of persons and property to and from the

United States in order to safeguard against threats to the citizenry from contraband, smuggling, and illegal activity. *See*, *e.g.*, *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973) (internal quotation marks omitted) ("Travellers may be [] stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in.").

Unlike the purposes underlying searches incident to arrest, the purposes underlying the border search doctrine apply in full force to searches of electronic media, which can contain evidence of ongoing transnational crime (e.g., messages, digital payments, photos, etc.) or contraband (e.g., child pornography). "Allowing customs officials without a warrant to forensically search an electronic device presented at an international border or its equivalent is utterly consistent with its historical mooring of protecting the country by preventing unwanted goods" from crossing the international border. *United States v. Feiten*, 2016 WL 894452, at *6 (E.D. Mich. Mar. 9, 2016); *see also Touset*, 890 F.3d at 1235 ("[I]f we were to require reasonable suspicion for searches of electronic devices, we would create special protection for the property most often used to store and disseminate child pornography" and "we see no reason why we would permit traditional, invasive searches of all other kinds of property, but create a special rule that will benefit offenders who now conceal contraband in a new kind of property.").

Only once has the Supreme Court ever required any heightened suspicion to justify a border search or seizure, and that case involved the extreme and nonroutine factual situation of a prolonged detention of a defendant—suspected of smuggling drugs in her digestive tract—for a monitored bowel movement. *Montoya de Hernandez*, 473 U.S. at 534–36, 541–42. The Court specifically refrained from defining further "what level of suspicion, if any, [would be] required

for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches," *id.* at 541 n.4, and, in cases involving border searches of property, the Court has rejected lower court decisions cabining the government's plenary border search authority. *See, e.g.*, *Flores-Montano*, 541 U.S. at 150 (overturning Ninth Circuit decision requiring reasonable suspicion to conduct a border search of an automobile gas tank); *Ramsey*, 431 U.S. at 607–08, 620–24 (overturning D.C. Circuit decision requiring probable cause and a warrant before opening international mail). "In more than 200 years of border search precedent, [] the Supreme Court [has never] found a border search unconstitutional." *Mendez*, 103 F.4th at 1307.

In *Flores-Montano*, a decision issued nine years after *Montoya de Hernandez*, the Court cautioned against "[c]omplex balancing tests" to categorize items crossing the border that might require individualized suspicion. 541 U.S. at 152. Both cases reflect the Supreme Court's hesitance to unduly constrain the sovereign's border authority by arbitrarily assigning higher levels of privacy at the border to particular categories or items, or to particular types of searches.

Accordingly, the manual border search of the defendant's iPhone was consistent with the government's longstanding interest and prerogative to prevent the importation of contraband into the United States and to uncover evidence of ongoing transnational crime. Further, the manual border search of the defendant's iPhone did not require a warrant, probable cause, or any heightened level of suspicion, and the defendant has not cited any binding authority that says otherwise. Thus, the defendant's motion should be denied.

## III.    Even If the Court Finds Reasonable Suspicion for the Manual Search Was Required, Law Enforcement Had it in This Case.

The manual border search of the defendant's iPhone did not require reasonable suspicion; nevertheless, in this case HSI had reasonable suspicion to search the defendant's cell phone for contraband and evidence of ongoing transnational crime.

Reasonable suspicion means a "minimal level of objective justification." *INS v. Delgado*, 466 U.S. 210, 217 (1984). It requires only a "particularized and objective basis for suspecting the particular person stopped of criminal activity" based on the totality of the circumstances. *Navarette v. California*, 572 U.S. 393, 396-97 (2014); *see also United States v. Kolsuz*, 185 F. Supp. 3d 843, 859 (E.D. Va. 2016), *aff'd*, 890 F.3d 133 (4th Cir. 2018) (the reasonable suspicion standard relates to ongoing or imminent crime). It therefore requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* "In assessing the reasonableness of the suspicion, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations and citation omitted). "[E]ven 'a series of acts that appear innocent, when viewed separately, may warrant further investigation when viewed together.'" *United States v. Gonzalez*, 781 F.3d 422, 428 (8th Cir.) (quoting *United States v. Weaver*, 966 F.2d 391, 394 (8th Cir. 1992)), *cert. denied*, 577 U.S. 859 (2015). This totality of the circumstances standard precludes a "divide-and-conquer" analysis of each fact and circumstance separately. *Arvizu*, 534 U.S. at 274.

## A. HSI Had Reasonable Suspicion of Ongoing Transnational Crime.

HSI had reasonable suspicion that the defendant was engaged in ongoing child sex trafficking and child sex tourism and reasonably suspected his phone would contain child

pornography prior to the border search.[15] By the time the defendant landed at MIA on November 1, 2024, law enforcement was already aware of several key facts and circumstances that, when viewed together, provided reasonable suspicion for the border search of the defendant's iPhone. *United States v. Sokolow*, 490 U.S. 1, 9 (1989) ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."). Specifically, SA Ballard knew about the pervasive and growing issue of child sex tourism in Medellin. She knew that many of those tourists were U.S. citizens. She gained important insight into the issue from her trips to Colombia and her investigation of Stefan Correa and spinoff cases. SA Ballard knew that Correa used messaging applications, including WhatsApp, to communicate with traffickers and recruiters prior to his

---

[15] The defendant claims that HSI agents "recruited CBP to conduct a 'primary inspection' of Mr. Inofuentes so that HSI agents could conduct a purported 'border search'" of his iPhone. Dkt. 61 at 1. This argument is factually wrong and legally irrelevant. *First*, CBP and HSI work together at the airport to ensure border security. CBP is primarily tasked with border management and control while HSI's airport group conducts federal criminal investigations related to transnational crime. Therefore, it is not unusual or legally problematic for HSI to request that CBP conduct a border search of a traveler who is being investigated by HSI. *See Irving*, 452 F.3d at 123 ("[T]he validity of a border search does not depend on whether it is prompted by a criminal investigative motive"); *United States v. Vallerius*, 2018 WL 2325729, at *7 (S.D. Fla. May 1, 2018), *report and recommendation adopted*, 2018 WL 2324059 (S.D. Fla. May 22, 2018) (a search of an individual's belongings at an airport is unaffected by the fact that the search is prompted by other law enforcement agents or an investigative motive) (citing *United States v. Schoor*, 597 F.2d 1303, 1306 (9th Cir. 1979) (Kennedy, J.) ("That the search was made at the request of the DEA officers does not detract from its legitimacy. Suspicion of customs officials is alone sufficient justification for a border search[, and] [t]he source of that suspicion is irrelevant in sustaining the search.") (citations omitted); *United States v. Levy*, 803 F.3d 120, 123 (2d Cir. 2015) ("We also conclude that the CBP officer was entitled to rely on information provided by the DEA task force to justify the border search . . . Whether a Customs official's reasonable suspicion arises entirely from her own investigation or is prompted by another federal agency is irrelevant to the validity of a border search[.]")); *Irving*, 452 F.3d at 123 ("As pretext should not determine the validity of a border search, it also should not determine whether a border search is routine (meaning it does not require reasonable suspicion)"). *Second*, once a traveler is sent from the main customs line to secondary inspection, there is only secondary inspection. The CBP Officer is not vetting the defendant for secondary inspection; he is already in it.

travel to Colombia to arrange for sex with certain minors. She also knew that Correa created sexually explicit videos of the minors and kept them on his cell phones.

When SA Ballard began investigating the defendant (prior to his arrival at MIA), she observed meaningful parallels between the defendant and Correa. Like Correa, the defendant had frequent and sustained travel to Colombia over several years. Like Correa, the defendant traveled to Colombia/Medellin from Miami and often stayed for short periods of time—less than one week and sometimes just three or four days. Like Correa, the defendant had sent small sums of money via a money service business (MSB) to Subject-1, an individual suspected of involvement in child sex trafficking in Colombia. Correa, too, had used MSBs to pay suspected traffickers, recruiters, and minors in Colombia.  SA Ballard also knew that on November 1, 2024, the defendant was returning to Miami from Colombia for the second time in a matter of weeks, and thus she reasonably suspected that the defendant was actively engaged in ongoing child sex trafficking in Colombia.

The defendant urges this court to view each factor in isolation from the rest, but taken together these facts combine to clearly show reasonable suspicion for ongoing transnational crime. In this same vein, the defendant argues there is "zero illegality as to any of the [p]ayments" he made to Subject-1 (Dkt. 61 at 5) and had HSI "actually investigated [the defendant's] connection to [Subject-1]" they would have learned as much (Dkt. 61 at 4). But the question is whether SA Ballard possessed reasonable suspicion at the time of the border search, not whether her reasonable suspicion was ultimately confirmed. *See United States v. Sanchez*, 572 F.3d 475, 478-79 (8th Cir. 2009) (concluding that an officer had reasonable suspicion that a car did not display valid proof of vehicle registration even though the officer turned out to be wrong); *id.* (determination of whether probable cause for stop existed is not to be made with

vision of hindsight, but instead by looking to what officer reasonably knew at time, and same is true for reasonable suspicion.). Again, while the defendant's payments to Subject-1 put him on HSI's radar, there were several other factors that ultimately led to SA Ballard's reasonable suspicion of ongoing transnational crime and the lookout to CBP.

The defendant emphasizes the fact that the government indicated Subject-1 is not a co-conspirator in this case (*see* Dkt. 61 at 4), but it is not clear how this helps him. The fact is the defendant made five payments in suspicious amounts to an individual suspected of engaging in child sex trafficking.[16] Then, when his iPhone was manually inspected, law enforcement found evidence that he had engaged in illicit sexual conduct with another individual—MV1. Surely the fact that the defendant is connected to not one, but two individuals in Colombia involved in child sex trafficking does not diminish suspicion regarding his conduct there.

The defendant also argues that the border search was "untethered from the enumerated, traditional justifications for a non-routine, invasive border search" (Dkt. 61 at 17) and largely offers *Aigbekaen* in support of this contention. But *Aigbekaen* involved a forensic border search of electronic devices related to a *domestic* sex trafficking investigation. *See* 943 F.3d at 717-19. That case is inapposite here, where SA Ballard was investigating individuals who travel from the U.S. to sexually exploit minors in a *foreign* country. Indeed, the border search exception takes on additional importance when cross-border child sexual exploitation is involved.

The defendant was charged with a violation of Section 2423(c), enacted as part of the PROTECT Act to "address[ ] a number of problems related to persons who travel to foreign countries and engage in illicit sexual relations with minors." H.R. Conf. Rep. 108-66, 108th

---

[16] It is worth noting that the defendant also apparently paid MV1 for food and necessities while simultaneously engaging in illicit sexual conduct with her.

Cong. 1st Sess. 2003, reprinted in 2003 U.S.C.C.A.N. 683, 686. As part of the Violence Against Women Reauthorization Act of 2013 ("VAWA"), Congress expanded the extraterritorial child sexual exploitation provisions of Section 2423(c) to reach U.S. citizens who temporarily or permanently reside overseas and to allow for the prosecution of: "[a]ny United States citizen or alien admitted for permanent residence who travels in foreign commerce or resides, either temporarily or permanently, in a foreign country, and engages in any illicit sexual conduct with another person." Violence Against Women Reauthorization Act of 2013, Pub. L. No.113-4, 127 Stat. 54 (2013); *see also* 157 CONG. REC. S4228 (2011) (the purpose of the amended language was "to combat human trafficking both abroad and at home") (statement of Senator Patrick Leahy).[17]

The legislative history of Section 2423(c) makes abundantly clear that cases investigated and charged under this Section relate to human trafficking abroad—i.e., transnational crime. Indeed, the criminal violation is intended to address problems "related to persons who travel to foreign countries and engage in illicit sexual relations with minors." As such, SA Ballard's reasonable suspicion that the defendant was traveling back and forth to Colombia to sexually exploit minors constitutes far more than "some nexus to the border search exception's purposes" including "evidence of ongoing transnational criminal activity," which is all that is required under *Kolsuz*. *See Kolsuz*, 890 F.3d at 144 ("[W]e agree with the government's bottom line: Because the forensic search of Kolsuz's phone was conducted at least in part to uncover

---

[17] *See also* S. Rep. No. 112-96, at 6, 18 (2011) (amended language "acknowledge[d] the need to address the massive scale of global trafficking and the fact that much domestic trafficking has roots in international trafficking rings" and to "combat the scourge of human trafficking in the United States *and around the world*") (emphasis added); *id.* at 8 (amended language was "strengthened to hold criminally liable those U.S. citizens and lawful permanent residents residing outside of the United States who engage in illicit sexual conduct with a minor").

information about an ongoing transnational crime—in particular, information about additional illegal firearms exports already underway, by freight or in the custody of a coconspirator, it fits within the core of the rationale underlying the border search exception.") (cleaned up).

Notably, the Eleventh Circuit has no requirement for a nexus between the border search and its traditional rationale. *See Alfaro-Moncada*, 607 F.3d at 728 (citing *Denson v. United States*, 574 F.3d 1318, 1339 (11th Cir. 2009) ("It is beyond peradventure that searches made at the border, pursuant to the long-standing right of the sovereign to protect its territorial integrity, renders preliminary searches and seizures *per se* reasonable .... Entrants, therefore, are subject to search even in the absence of reasonable suspicion, probable cause, or warrant.")); *United States v. Smith*, 673 F. Supp. 3d 381, 397 (S.D.N.Y. 2023) (noting the First and Eleventh Circuits have held that the government may search cell phones at the border without a warrant and without any heightened requirement of nexus between the search and the government's interests in preventing the entry of unwanted persons or items) (citing *Alasaad*, 988 F.3d at 21 and *Touset*, 890 F.3d at 1232)). "Additionally, the Eighth Circuit recently indicated its likely agreement with the First and Eleventh Circuits" although ultimately "the court declined to definitively resolve whether there is any nexus requirement." *Smith*, 673 F. Supp. 3d at 397 (citing *Xiang*, 67 F.4th at 900-03).

Therefore, HSI did not need reasonable suspicion of transnational crime in order to conduct its border search according to Eleventh Circuit law, but in any case, it had such reasonable suspicion, consistent with what is required in the Fourth Circuit.

### B. HSI Had Reasonable Suspicion to Believe the Defendant's Crimes Were Ongoing.

When SA Ballard entered the lookout for the defendant on November 1, 2024, she had reasonable suspicion to believe he was engaged in *ongoing* transnational crime. The reasonable suspicion was neither "stale" (Dkt. 61 at 18), nor based solely on the October 2023 payments to

Subject-1, as discussed above. It was based on a combination of factors, including the defendant's approximately 14 trips to Colombia *after* the October 2023 payments to Subject-1 and the fact that on November 1, 2024, the defendant was returning from his second trip to Colombia (lasting only 4 days) in just a few weeks. His first October 2024 trip to Colombia lasted only 3 days. *See* Exhibit 1 at 1.

The facts of this case stand in contrast to those in *Irshaid, et al. v. Garland*, 2025 WL 756544 (E.D. Va. Mar. 10, 2025) (*see* Dkt. 61 at 18), in several ways. First, in *Irshaid*, the Court noted that "the officers who conducted the search of [plaintiff's] devices relied on nothing more than the fact that his name appeared in the [Terrorism Screening Database]" or TSDB. *Id*. at 9. And "inclusion in the TSDB supports, at best, an inference that reasonable suspicion of national security-related crimes existed at and around the time of nomination—not months or years later." *Id*. Here, SA Ballard had specific reason to believe that the defendant's involvement in child sex trafficking was ongoing. He had made numerous trips to Colombia since the October 2023 payments, and he was returning from Colombia to the U.S. on the date of the border search. Second, in *Irshaid* the court observed that "the scope of activities that might satisfy the standard for inclusion in the TSDB" might not necessarily relate to "protecting national security." *Id*. The court noted that the academic study of terrorism or the investigative reporting of terrorist activities could plausibly meet the standard for inclusion in the TSDB. Here, there is no such confusion. The lookout was based on reasonable suspicion of ongoing criminal activity as opposed to innocent and/or non-criminal conduct.

In sum, SA Ballard had reasonable suspicion of ongoing transnational crime to support the search of the defendant's iPhone, and that suspicion was not stale on November 1, 2024.

IV.     **Suppression is Unwarranted in any Event Because Law Enforcement Agents Acted in Good Faith Reliance on Binding Appellate Precedent.**

Even if this Court were to determine that reasonable suspicion was necessary for the manual border search of the defendant's cell phones and that agents did not have that reasonable suspicion when they performed the manual search (which it should not), this conclusion would not require the exclusion of the evidence resulting from the search. *See Kolsuz*, 890 F.3d at 147 ("[E]ven if a search is judged to be constitutionally flawed in some way, its fruits need not be suppressed if the agents acted in reasonable reliance on binding precedent.") (quoting *Davis v. United States*, 564 U.S. 229, 241 (2011); *see also Herring v. United States*, 555 U.S. 135, 141 (2009) (even where there has been an unlawful search, a defendant has no automatic right to suppression); *United States v. Baker*, 719 F.3d 313, 320–21 (4th Cir. 2013) (describing *Davis*)). "In such circumstances, suppression can do little to deter police misconduct, and the social costs of suppression—the exclusion from trial of reliable evidence bearing on guilt or innocence— outweigh any deterrence benefits." *Id*. (internal quotation marks omitted).

Because suppression imposes a "costly toll upon truth-seeking and law enforcement objectives" and "offends basic concepts of the criminal justice system" by "letting guilty . . . defendants go free," a court must also find that "the benefits of deterrence . . . outweigh the costs," which are heavy. *Herring*, 555 U.S. at 141 (quotation marks omitted); *see also Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 364-65 (1998) (exclusionary rule's cost "presents a high obstacle for those urging [its] application"). It is well established that "when the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Davis*, 564 U.S. at 238 (internal citations and quotation marks omitted). Thus, as the Supreme

Court has held, "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Id.* at 241.

In this case, the agents' manual border inspection of the defendant's iPhone was entirely consistent with binding appellate precedent in the Eleventh Circuit, which does not require any heightened level of suspicion for a manual border search or even a forensic border search. [18] *See* discussion of *Touset*, *Vergara*, and *Pulido supra* pp. 20-22.  Furthermore, the agents were entitled to search for both contraband and evidence. *Pulido*, 133 F.4th at 1274-75 (rejecting Pulido's argument that government officials exceeded the scope of the border-search exception when it reviewed his private messages); *id.* ("[Neither *Vergara* nor *Touset*] purports to restrict the

---

[18] Because the at-issue border search occurred in Miami, this court should assess the agent's good faith according to Eleventh Circuit precedent. *See, e.g.*, *United States v. Restrepo,* 890 F. Supp. 180, 191 (E.D.N.Y. 1995) ("The Memphis officers should have been able to rely on their understanding of the law in the Sixth Circuit and could not have been expected to know the law in circuits other than the one in which they were operating. Consequently, suppression of evidence inadmissible in this circuit but admissible in the Sixth Circuit would not deter misconduct of officers based in Memphis; rather, it would penalize officers' good faith efforts to comply with the law."); *Ozuna*, 129 F. Supp. 2d at 1354 ("Because the primary purpose of the exclusionary rule is to deter future police misconduct, Trooper Curry's encounter with Mr. Ozuna should be analyzed against the backdrop of Fourth Circuit law to determine whether the Rule 404(b) evidence should be suppressed."); *Cf. Davis*, 564 U.S. at 239-41 ("[e]vidence obtained during a search conducted in reasonable reliance on binding [circuit] precedent is not subject to the exclusionary rule").

Law enforcement also acted in good faith according to existing Fourth Circuit precedent. *See Ickes*, 393 F.3d at 505-506 (upholding the manual border search of a computer because border searches constitute a "well-recognized exception to the safeguards of the Fourth Amendment" that derives from the sovereign's right to police its borders and to protect its citizens."); *see also id.* at 505 ("'The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border. Time and again, we have stated that searches made at the border . . . are reasonable simply by virtue of the fact that they occur at the border.'"); *United States v. Linares-Delgado*, 259 F. App'x 506, 508 (3d Cir. 2007) (citing *Ickes* and holding that viewing of video footage on camcorder detained at border was a reasonable border search not requiring a warrant, consent, or reasonable suspicion).

operation of the border-search exception to searches for contraband. To the contrary, both opinions use categorical language. *See, e.g.*, *Vergara*, 884 F.3d at 1312 ("[W]e require reasonable suspicion at the border *only* for highly intrusive searches of a person's body ...." (emphasis added) (quotation marks and citation omitted)); *Touset*, 890 F.3d at 1233 ("The Supreme Court has never required reasonable suspicion for a search of property at the border, however non-routine and intrusive, and neither have we."); *id.* at 1234 ("Property and persons are different."); *id.* at 1231 ("[T]he Fourth Amendment does not require any suspicion for forensic searches of electronic devices at the border.")).

It is therefore undeniable that law enforcement in this case acted in objectively reasonable good faith reliance on the Supreme Court's long-established border search precedents as well as the Eleventh Circuit's precedents. Thus, suppression would not be available even if the defendant's Fourth Amendment argument had merit. *Cf. United States v. Craig*, 861 F.2d 818, 820 (5th Cir. 1988) ("Principles of judicial restraint and precedent dictate that, in most cases, we should not reach the [Fourth Amendment] issue if a decision on the admissibility of the evidence under the good-faith exception . . . will resolve the matter.").

**CONCLUSION**

For the reasons stated above, the Court should deny the Defendant's Motion to Suppress.

Respectfully submitted,

Erik S. Siebert
United States Attorney

Date: May 1, 2025                    By: _____/s/_____
                                         Lauren Halper
                                         Laura Withers
                                         Assistant United States Attorneys
                                         United States Attorney's Office
                                         2100 Jamieson Avenue
                                         Alexandria, Virginia 22314
                                         Tel.: (703) 299-3700
                                         Lauren.Halper@usdoj.gov
                                         Laura.Withers@usdoj.gov