IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Case No. 1:25-cr-00005 |
| MICHAEL JAIME INOFUENTES, ) | The Honorable Patricia T. Giles |
| ) | |
| Defendant. ) | |
| ) | |

**DEFENDANT'S REPLY IN SUPPORT OF HIS
OPPOSED MOTION TO SUPPRESS**

Michael Inofuentes, by and through undersigned counsel, files this reply to the government's response ("Response," ECF No. 98) to his Motion to Suppress ("Motion," ECF Nos. 92, 93).

The government does not meaningfully engage with the substance of the agents' misconduct during the Miami Interview. The transcript of the Miami Interview reveals a stark difference in behavior by the agents than what is described by the government in its Response. The transcript shows that the agents used false pretenses to obtain an unknowing and involuntary *Miranda* waiver from Mr. Inofuentes. The transcript also shows that the agents coerced Mr. Inofuentes into making statements in an attempt to find some basis to arrest him, even though none existed at the outset of the Miami Interview.

The government also takes liberty in attacking the credibility of Mr. Inofuentes at every turn as a purported excuse for the agents' coercive and deceptive conduct during the Miami Interview. During the Miami Interview, the agents repeatedly attempted to put words in the mouth of Mr. Inofuentes, badgered him when he denied certain conduct, and otherwise expressed

1

incredulity at his answers. The Miami Interview was not the casual "small talk" and cordial interaction that the government claims. Resp. at 16.

The government seeks to have it both ways in arguing about Mr. Inofuentes' conduct during the Miami Interview. On the one hand, the government argues that Mr. Inofuentes repeatedly lied and was evasive during the badgering by agents in the Miami Interview. On the other, the government seeks to emphasize Mr. Inofuentes' general statements that he was willing to help agents in what he was misled into believing were their genuine efforts to collect information about drug smuggling and other activities in Colombia. Resp. at 29 (arguing that Mr. Inofuentes was "happy to help" agents in what he was misled into believing was a genuine, background interview about his knowledge of the "box checking" topics). In other words, the government credits Mr. Inofuentes' statements when it suits them but discredits him when it does not.

As to the government's claims that Mr. Inofuentes "lied" about his interactions with Individual-1, there is no recognition by the government in its Response that the topics being discussed with Mr. Inofuentes were "super uncomfortable," Mot., Ex. 1, Tr. at 93:16, and that Mr. Inofuentes relented to the agents' badgering only after he was compelled "to defend this like, until the end." *Id.* Tr. at 105:6-7 & Tr. at 107:17-21 (compelling Mr. Inofuentes to tell agents "the answer is yes" to whether he had sex with Individual-1). The government focuses on this one sentence, which it cherry picks from the multi-hour Miami Interview and divorces the statement from its deceptive and coercive context. But this statement alone, which the government relies on to build this case, does not prove the criminal charge. This statement does nothing to prove that Mr. Inofuentes *paid or attempted to pay* Individual-1 for sex, which is the conduct that is charged and what the government must prove at trial. On that point, Mr. Inofuentes told agents during the Miami Interview that he never paid or attempted to pay Individual-1 for sex and will prove as

2

much at trial. *See* Ex. 1, Tr. at 110:2 – 112:15. The government wholly ignores this repeated denial, presumably because it is inconsistent with its theory.

Suppression is required for the reasons set out in the Motion, as well as the following reasons in this reply.

I. **In an effort to coerce statements to support a criminal charge, agents detained Mr. Inofuentes in a secured room during the Miami Interview and interrogated him for hours**

Agents escorted Mr. Inofuentes out of the secondary "lobby" to a private, access-controlled interview room and interrogated him for approximately three hours. He repeatedly expressed concern about wanting to leave to catch his next flight. Notwithstanding those statements, agents did not release him.

The government has pointed to nothing that it had collected prior to the Miami Interview to support its current charge. The sole purpose of the Miami interview was to circumvent the Fourth Amendment and collect Mr. Inofuentes' electronic devices without a warrant and under the guise of a border search. After doing so, the agents then badgered Mr. Inofuentes repeatedly about his private messages and interactions in an attempt to build a criminal case against him. This conduct was the antithesis of a legitimate border search.

During the Miami Interview, a reasonable person would not have felt at liberty to leave. Indeed, Mr. Inofuentes was not at liberty to leave. As noted below, Agent Ballard expressly denied Mr. Inofuentes permission to leave, and Mr. Inofuentes would have been arrested had the AUSA in SDFL not declined Agent Ballard's attempts to charge Mr. Inofuentes with a felony at that time. Mr. Inofuentes was therefore in custody for purposes of *Miranda.*

Agent Ballard's statements at the conclusion of the first part of Mr. Inofuentes' Miami Interview confirm that Mr. Inofuentes was in custody. Agent Vargas asks Agent Ballard, "You

want me to send him back out there? You want him --." Ex. 1, Tr. at 149:23-25. Agent Vargas was referring to escorting Mr. Inofuentes out of the access-controlled interview room and back to the waiting or "lobby" area. *See* Resp. at 2 (referring how Mr. Inofuentes was moved out of the "secondary inspection area . . . [that] includes a lobby and adjoining corridor" and into the "interview room"). And Agent Vargas was asking Agent Ballard what restrictions Agent Ballard wanted to remain in place with respect to Mr. Inofuentes. Agent Ballard declined to allow Mr. Inofuentes to leave the interview room, even with an escort. She replied, "He can stay right there." Ex. 1 at 149:25. The restraint on Mr. Inofuentes' freedom of movement was real. *Cf.* Resp. at 2 (claiming that Mr. Inofuentes had "freedom of movement around the secondary inspection area").[1] Per Agent Ballard's express instruction, Mr. Inofuentes was not free to leave the interview room until she allowed it. *See* Ex. 1, Tr. at 149:25.

Agents' confinement of Mr. Inofuentes to the isolated "interview room" is distinct from "general, routine questioning" at the border in the open "lobby" of the secondary inspection area in view of other travelers. *Cf.* Resp. at 11, 15-16. Indeed, the government's citation to *United States v. Galloway*, 316 F.3d 624, 630 (6th Cir. 2003) proves the point. Resp. at 11. In *Galloway*, the Sixth Circuit distinguished the defendant's questioning "in plain view of other travelers" to inapposite facts that would indicate a custodial interrogation: being "taken to a room or another part of the airport." *Id.* Such is the case here. Mr. Inofuentes was not questioned about routine border topics in the open, after passport control, and in front of other travelers where he had freedom to walk away to another part of the airport. *Cf.* Resp. at 11 (citing to *Chavez-Martinez*). Once assigned to secondary inspection, Mr. Inofuentes was escorted to a confined, access-

---

[1] Freedom to move around a secondary inspection area is still a complete restriction on freedom. There is no independent entry into the country from secondary inspection, and going back – which one is not free to do – leads only to the initial passport control.

4

controlled room, where he was detained, physically separated from other travelers, and under the watch of two agents. It was "right there" that Agent Ballard instructed Mr. Inofuentes to "stay" until she said otherwise. Ex. 1, at 149:25.

The nature of Agent Ballard's questions also underscores how Mr. Inofuentes was in custody. *See, e.g.*, *United States v. Djibo*, 151 F. Supp. 3d 297, 306 (E.D.N.Y. 2015) (reciting how "the *most* important factor in determining whether *Miranda* applies at our borders will often be the objective function of the questioning") (emphasis in original). The questions of Agent Ballard were not routine questions that a traveler would expect at the border. *See, e.g.*, Resp. at 2 (highlighting the routine questions by CBP Officer Oliveria – before the interview with Agent Ballard – about "the nature of his travel, including where he was coming from, where he was going, the purpose of his trip, and what he was bringing into the country."). The agents instead structured questions to elicit statements from Mr. Inofuentes that the agents could then use to try to incriminate him after impermissibly searching his electronic devices. Put simply, the agents were attempting to extract incriminating statements from Mr. Inofuentes in an initial failed bid to charge him with a felony. The function of these questions was "fundamentally different" from what a reasonable traveler would expect to answer at the border. *Djibo*, 151 F. Supp. 3d at 306. The questions themselves – in addition to the environment in which they occurred – therefore cut sharply in favor of custody for purposes of *Miranda*.

Throughout the interview, Agent Ballard also repeatedly misled Mr. Inofuentes by stating that, as soon as he answered the agents' questions, the interview would be over and he would be free to leave. *Cf.* Resp. at 16-17 (arguing that Mr. Inofuentes was led to believe that he did not have to answer the agents' questions). Agent Ballard repeatedly told him that the interview would be "wrapped up" once he answered their questions. *See, e.g.*, Mot. at 11 ("Just – I mean, just spit

5

it out so we can wrap up this interview, honestly. I know you have another flight to catch. This is our last check in the box. So that's pretty much it." & "Just get to the point, we get this over with, and we get out of here."). In other words, Agent Ballard instructed Mr. Inofuentes that answering the agents' questions was the condition precedent to his departure on the next flight. *Id.* Even when the first part of the interview ended, Agent Ballard instructed another agent that Mr. Inofuentes was to "stay right there" until she said otherwise. Mr. Inofuentes was not free to leave. Ex. 1, Tr. at 149:25.

In light of all of these circumstances, a reasonable person in Mr. Inofuentes' position would not have felt he was free to leave. Agent Ballard confirmed as much in her own words. He was therefore in custody for purposes of *Miranda*.

II. **Agents affirmatively misled Mr. Inofuentes about the nature and circumstances of his *Miranda* waiver and otherwise engaged in coercive and deceptive conduct designed to extract incriminating statements from him**

The agents' fraud and deception permeated the Miami Interview. The *Miranda* waiver was obtained through intentionally false and misleading representations about the circumstances as to when Mr. Inofuentes' Constitutional rights would come into play. That same deception and coercion permeated the agents' efforts to have Mr. Inofuentes incriminate himself as to his interactions with Individual-1. Suppression is required.

First, the government attempts to engage in semantics and word-smithing to argue against Agent Ballard's explanation that Mr. Inofuentes' *Miranda* waiver applied to a topic that was not of interest: drug smuggling. *See* Resp. at 19 (arguing that Agents "never stated he was being questioned only about drugs"). Agent Ballard explicitly told Mr. Inofuentes that his Constitutional rights would come into play on the off chance that he would unintentionally "vomit" out a confession about moving drugs. Mot. at Ex. 1, Tr. at 25:10-15. The government attempts to argue

Agent Ballard's mention of "those types of topics," Resp. at 19, somehow operates as a safe harbor for Agent Ballard and negates her misleading explanation that the *Miranda* waiver was important for purposes of discussing the "problem set" of cartel activity. It does not. The *Miranda* waiver was directly preceded by lengthy discussion about how agents sought to question Mr. Inofuentes about drug smuggling. *See* Mot. at Ex. 1, Tr. at 24:7 – 25:22. Indeed, immediately after fraudulently inducing Mr. Inofuentes to execute a *Miranda* waiver, Agents confirmed the relevance of his *Miranda* waiver: "Ok. Perfect. Appreciate it. Do you smuggle drugs?" Mot. at Ex. 1, Tr. at 29:2-3.

In doing so, the agents materially downplayed the importance of Mr. Inofuentes' *Miranda* rights by explaining before, during, and after his waiver that his rights were applicable to a "problem set" of drug smuggling and cartel activity in Colombia. Indeed, Agent Ballard said as much, "So because of that, for that reason, **before we start that line of questioning**, we want to make sure that you understand that at any point in time **of this part**, you can stop. You can say, I don't want to answer that question, or I don't want to answer any questions." Mot. at Ex. 1, Tr. at 25:17-22. *Cf.* Resp. at 19 (arguing against the transcript that Agent Ballard did not "suggest or imply" that Mr. Inofuentes' *Miranda* rights only applied to drug smuggling).

In this way, the agents deceptively framed and anchored Mr. Inofuentes' Constitutional rights to one specific topic of drug smuggling – "this part" – and obtained his waiver of those rights based on intentional deceit as to the circumstances in which it would apply. Mr. Inofuentes' relinquishment of his Constitutional rights was therefore unknowing and involuntary.

Second, after fraudulently inducing the *Miranda* waiver, the government argues against the plain record that agents did not compel Mr. Inofuentes to speak in contradiction of his Constitutional rights. The government's contention that the agents did not "intimate[] to the

defendant that he had a duty to speak" is belied by the agents' statements. Resp. at 19, 22, 27. In questioning Mr. Inofuentes about Individual-1, agents instructed Mr. Inofuentes to "just say it" and "[y]ou have to say it. Plan English" and "just spit it out" and "just get to the point." Mot at. 11. These statements were not, as the government suggests, passing reminders to Mr. Inofuentes that if he was going to speak, he should do so truthfully. *Cf.* Resp. at 26. The statements were instead commands to speak. And these commands contradicted Mr. Inofuentes' most fundamental Constitutional right – his right to remain silent – and were uttered in an intentional manner to coerce and deceive Mr. Inofuentes into making statements that the government would then try to use in a way to make them seem to be incriminating.

Third, the government does not address Agent Ballard's false promises of leniency. Agent Ballard told Mr. Inofuentes on numerous occasions that his answers were only part of a box-checking exercise and that he would be free to leave as soon as he answered the agents' questions relating to general "problem sets" about issues in Colombia, like drug smuggling and cartel activity. Mot. at 11-13.

Such promises of leniency were again deceptive, coercive, and intentionally uttered as false promises of leniency to extract, what the agents believed to be, incriminating statements to be used against Mr. Inofuentes in a criminal proceeding. The government does not even try to defend these statements beyond denying that promises were made, Resp. at 27, which is contradicted by the record. *See* Mot. at 11 ("Just – I mean, just spit it out so we can wrap up this interview, honestly. I know you have another flight to catch. This is our last check in the box. So that's pretty much it." & "Just get to the point, we get this over with, and we get out of here.").

It is also no defense that agents made these comments, as the government suggests, because they believed that Mr. Inofuentes was not telling the truth. In fact, the coercive impact of such

8

statements is heightened in that circumstance. Agents made these promises to try to put Mr. Inofuentes at ease. As the hours passed and he missed one flight and then the next, he was anything but at ease, as he had to return to the District for work. Seeking to take advantage of this dynamic, agents gave Mr. Inofuentes the false and incorrect understanding that any statements he made would not be used against him but were instead just part of a "box checking," routine exercise. The opposite was true. And the coercive impact was clear: tell us what we think happened and you will be on the next flight. *Id.* It was only because a federal prosecutor declined this case that Mr. Inofuentes was in fact free to leave the interview room on his own accord. *See* Resp. at 18 (claiming somehow that because Mr. Inofuentes was free to leave only because a prosecutor declined Agent Ballard's attempt to charge him with a felony that Mr. Inofuentes therefore had "freedom to depart").

III. **CONCLUSION**

For the reasons stated in the Motion and this reply, the agents' coercive and deceptive behavior led to an unknowing and involuntary *Miranda* waiver and compelled statements thereafter. The Court should grant the Motion to suppress all statements made during the Miami interview, and all fruits of that interview including but not limited to (i) any statements made at the government's subsequent interview of Mr. Inofuentes at Dulles airport, and (ii) any evidence obtained through the use of those statements including the search-warrant returns for Mr. Inofuentes' electronic devices.

Dated:  July 14, 2025

Respectfully submitted,

MICHAEL JAIME INOFUENTES
By Counsel

/s/_____
Nina J. Ginsberg, Esquire
Virginia State Bar No. 19472
Greenspun Shapiro Ginsberg & Yang PC
3955 Chain Bridge Rd., Fl. 2
Fairfax, VA 22030
Phone: (703) 352-0100
Fax: (703) 591-7268
Email:  njg@greenspunlaw.com

Scott Armstrong, Esquire
McGovern Weems, PLLC
1050 15th Street, Suite 1030, NW
Washington, D.C. 20005
DC Bar No. 993851
(admitted *pro hac vice*)
Telephone: (202) 978-1267
Email: scott@mcgovernweems.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of July, 2025, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to counsel of record.

/s/_____
Nina J. Ginsberg